

ENTERED
01/02/2018

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| IN RE<br><br>LAFFITE'S HARBOR<br>DEVELOPMENT I, LP, and<br>LAFFITE'S HARBOR<br>DEVELOPMENT II, LP,<br><br>Debtors, | § § § § § § § § § § § § | CASE NO. 17-36191-H5-11 |

### ORDER DENYING EMERGENCY FINANCING MOTION AND APPLICATION TO EMPLOY SELLING AGENT AND PROPERTY MANAGER

On December 20, 2017, this Court held a hearing to consider the Debtor's "Emergency Motion for Interim Order (I) Authorizing Post-petition Secured Financing and Super-Priority Administrative Expense Status; (II) Modifying the Automatic Stay; (III) Authorizing the Debtors to Enter into Agreements with Shady Bird Lending, LLC; (IV) Authorizing Use of Cash Collateral; (V) Granting Related Relief; and (VI) Scheduling a Final Hearing" (Docket No. 38) and "Emergency Application for Authority to Employ Selling Agent and Property Manager" (Docket No. 42). The Court denies the DIP financing motion and reserves ruling on the application to employ.

### I. Debtor's Prepetition Operations

Debtors own a real estate development on the west end of Galveston Island, Texas. Debtors partially platted the property for construction of luxury vacation homes, placed utility stubs on the platted lots, built common area amenities, and built two model homes.

P:\laffite-20180102.wpd

Debtors financed the development with loans from Icon Bank secured by essentially all of Debtors' assets. Icon Bank's representative, Rand Lassus, testified that the amount of Icon's debt as of the petition date in these cases was approximately $11.5 million. The approximate debt as of the date of the hearing was $11.75 million. Debtors do not dispute this figure.

Eric Finley conducted an appraisal of the property during February 2016. Finley's appraisal report concludes the value is, as of February 2016, $13,630,000. The report projects a value as completed with 142 partially developed lots to be $20,760,000. Finley testified that there has been no material change in the market since February, 2016. Finley is no longer employed by CBRE, the firm which prepared the appraisal.

William Roitsch worked on the appraisal with Finley and also signed the February 2016 appraisal report. Roitsch continues to work for CBRE. Roitsch testified he specializes in appraisal of subdivision developments. Roitsch conducted a second appraisal during October 2017. Roitsch's report states a total liquidation value of $17,225,000 for the property as is. (Icon Exhibit 6). Roitsch testified his report reflects the development status of the property as of the date of this second appraisal.[1]

Before Debtors filed these Chapter 11 cases, they sought to market lots in the property through two real estate brokerage companies, Heritage Texas and Legacy International. One of these brokerage companies obtained sale contracts for several of the lots. None of these sales closed. Robin Mueck (the proposed real estate broker for the estate) testified that Heritage Texas left the project because Debtors decided they wanted to proceed in a different direction at that

---

[1] Roitsch explained his reduced appraisal because the sales listings at the time of the first appraisal failed to close by the date of the second appraisal. The Court makes no finding at this time as to the value of the property.

time. She testified that she now believes Debtors can successfully implement a marketing strategy in these cases.

Debtors ran out of funds and filed the petitions in these Chapter 11 cases on November 7, 2017.

## II. The Proposed DIP Financing Transaction

Debtors seek approval of an interim financing transaction with Shady Bird Lending, LLC. ("Shady Bird") The proposed agreement calls for Debtors to borrow $4 million from Shady Bird, with $2.5 million to be disbursed before March 1, 2018. Debtors propose to grant Shady Bird a priming lien on property of the bankruptcy estate, a superpriority claim, a lien on avoidance actions, subject only to a carve out for certain administrative expenses of the bankruptcy cases, and a waiver of surcharge under Section 506(c). Debtors propose to pay a commitment fee of 2 percent ($80,000) of the total, a funding fee of 2 percent ($80,000) of the total, an exit fee of 4 percent of the amount advanced, interest at 10 percent, and Shady Bird's expenses (estimated in the budget to be $150,000). (Debtors' Exhibits 7, 10).

Debtors' budget for the period ending March 1, 2018, calls for Debtors to pay $1,437,764 in 2017 ad valorem property taxes on the development, $395,355 in construction expenses, $30,171 for marketing, and $636,710 in other expenses, including $126,000 to Debtors' proposed Chapter 11 counsel, and $72,000 to a management company owned by Debtors' principal, Michael Edwards. (Debtors' Exhibit 10).

### III. Debtors' Proposed Reorganization Prospects

Edwards testified Debtors intend to reorganize through the sale of lots to builders financed primarily through the EB-5 visa program.[2] Edwards intends to market the EB-5 investments to Chinese nationals. Debtors have engaged an attorney to handle EB-5 transactions and the EB-5 attorney has notified him that funds could begin coming to the Debtors within four to six months. He testified that Debtors anticipate receiving funds within 6 to 12 months.

Edwards testified the average sale price of lots is $300,000. However, he testified Debtors sold seven lots prepetition for $180,000 each. Edwards later testified that Debtor received $750,000 total for the seven lots.

### IV. The Proposed DIP Financing Transaction is Improper

Section 364(d)(1) of the Bankruptcy Code authorizes a trustee (including a Chapter 11 Debtor in possession) to obtain credit secured by a senior or equal lien on the property only if the trustee is unable to obtain such credit otherwise, and there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d)(1).

Edwards testified his management company interviewed potential investors prepetition and introduced one such potential investor to Icon Bank. He also testified Legacy International wanted to loan money to Debtors prepetition. Edwards testified Shady Bird contacted him to suggest this DIP transaction[3] and he had not sought any DIP financing postpetition other than that

---

[2]Edwards testified that the EB-5 program allows a foreign national to live and work permanently in the United States after making a business investment of $500,000.

[3]There is no evidence as to whether Legacy International or Debtor proposed any terms.

proposed by Shady Bird.

Edwards' testimony demonstrates that Debtors did not make even a rudimentary effort to comply with Section 364(d)(1) before seeking approval of a transaction which would prime Icon Bank's lien.

Additionally, the proposed DIP financing agreement is not in accord with a sound exercise of Debtors' business judgment. While certain favorable terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender. Thus, courts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest. The bankruptcy court cannot, under the guise of Section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements. *Cf. In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983). *See also In re Defender Drug Stores, Inc.*, 145 B.R. 312 (9th Cir. BAP 1992). The size of the proposed transaction in relation to the all estimates of value of the property is sufficiently large that the proposed priming lien amounts to a sub rosa plan.

This Court's Procedures for Complex Chapter 11 Bankruptcy Cases identifies terms which may be proper in DIP financing motions. The order provides with regard to liens on avoidance actions that the Debtor must show extraordinary circumstances. None are shown here. Similarly, the order disfavors limitations on surcharge of the lender's collateral under Section

506(c).

Moreover, Debtors' business reorganization prospects are highly speculative. The evidence before the Court is that Debtors were marketing the property before the petition was filed and found no takers who would close at or near the list price for the property. Debtors' only sale was a bulk sale of seven lots at a deep discount. Debtors' primary hope for reorganization involves a lengthy process of soliciting EB-5 investors and an uncertain result. Meanwhile, the terms of the proposed DIP financing require Debtors to repay the loan by December 31, 2018 or risk foreclosure, thereby wiping out subordinate liens and equity interests. Meanwhile, Debtors propose to pay $72,000 to their principal.

Finally, the proposed DIP transaction does not provide adequate protection to Icon Bank's interest in the property. Even assuming the value of the property is greater than the aggregate of the Icon Bank debt and the proposed DIP transaction, the Debtors' equity in the property is not sufficiently large to adequately protect Icon Bank's interest in light of the accrual of interest and administrative expenses. Lastly, Debtors propose no payment to Icon Bank, leaving its recovery dependent on Debtors' speculative scheme to obtain Chinese investment from individuals wishing to relocate to the United States.

Signed at Houston, Texas on January 2, 2018.

KAREN K BROWN
United States Bankruptcy Judge